So Ordered.

Dated: September 28, 2021



Katherine Maloney Perhach
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Randal L. Loehrke and
Marjorie K. Loehrke,
   Debtors.

Chapter 11

Case No. 20-24784-kmp

---

Weyauwega Star Dairy, Inc.,
   Plaintiff,

v.

Randal L. Loehrke and
Marjorie K. Loehrke,
   Defendants.

Adv. No. 20-2128

---

## DECISION AND ORDER

---

  Weyauwega Star Dairy, Inc. ("Star Dairy") has accused the Debtors in this bankruptcy case, Randal and Marjorie Loehrke, former dairy farmers, of defrauding the dairy by selling it watered-down milk. Star Dairy asserts that the milk it purchased from the Debtors was 70% water, and considering the amount of actual milk it received, it overpaid them by $366,833.22. According to Star Dairy, the Loehrkes perpetuated the fraud by switching the milk samples the milk hauler collected from their bulk tank to avoid detection of excess water in their milk. Star Dairy seeks a determination in this adversary proceeding that the debt owed to it is

nondischargeable under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6). The Loehrkes have filed counterclaims for fraud and breach of the duty of good faith and fair dealing seeking $412,308.03 in damages. After two days of testimony, and for the reasons that follow, the Court finds that the Loehrkes owe a nondischargeable debt to Star Dairy in the amount of $366,833.22 and dismisses the Loehrkes' counterclaims.

### Background

Star Dairy is owned and operated by the Knaus family in the small central Wisconsin town of Weyauwega. James Knaus and his sons, Michael, Gerard, and Dan, currently own and operate the dairy and the sons are the fourth generation of the Knaus family to do so. Star Dairy is an artisan cheese maker and makes approximately 53 million pounds of cheese every year. It typically obtains the milk for its cheese only from Wisconsin dairy farmers located within 50 miles of the cheese factory. Both Michael Knaus and Gerard Knaus testified during the trial. Michael Knaus handles the business operations for the dairy and Gerard Knaus is the master cheesemaker for the dairy. Both brothers grew up on a farm milking cows and demonstrated significant knowledge about milk production, running a dairy, and producing cheese.

The Loehrkes had a longstanding relationship with Star Dairy. Randal Loehrke is a fourth-generation dairy farmer and his father started selling milk to Star Dairy in approximately 1983 with Randal taking over the relationship in 1993. The Loehrkes maintained a milking herd of Holstein, Jersey, Brown Swiss, and cross-bred cows. Mr. Loehrke stated that the goal of his milking operation was to have a full bulk tank. According to Mr. Loehrke, his barn held 100 cows, and on average, each cow produced 70 pounds of milk per day, with the result being that his bulk tank, which holds 13,700 pounds of milk, was almost full every two days. The entire Loehrke family was involved in the dairy operation. Mr. Loehrke, with the help of his two sons, fed, milked, and bred the cows and Mrs. Marjorie Loehrke helped raise the calves and also

assisted with the dairy operation on the weekends and during the summer. As a family farm, they did all the work themselves.

The Loehrkes sold their milk exclusively to Star Dairy and were paid based upon the butterfat content, the protein content, and the volume of milk. The United States government sets the prices and they fluctuate on a monthly basis. Volume is the main component of the price. Premiums related to the butterfat or protein content of the milk may add a dollar or two to the price, but the final price is mainly determined by the volume.

Star Dairy terminated its relationship with the Loehrkes in May 2019. Star Dairy alleges in this nondischargeability adversary proceeding that the Loehrkes were adulterating the milk that they were selling to the dairy and that the Loehrkes' milk contained 70% water. Star Dairy asserts that the Loehrkes took advantage of their well-established relationship with Star Dairy, made false representations as to the quality of their milk, intentionally tampered with and switched out samples to perpetuate a fraud on the dairy over several years, and actively engaged in fraud to conceal their milk tampering to cheat, intentionally trick, and willfully and maliciously injure Star Dairy. All the while, Star Dairy continued to pay the Loehrkes the milk market price for a product that was 70% water, which financially harmed the dairy. The water in the Loehrkes' milk also negatively impacted Star Dairy as it reduced the amount of cheese the dairy could make and sell. In its Complaint, Star Dairy alleges that it incurred damages of $1,128,032.54 over four years as a result of the Loehrkes' false representations, fraud, and willful and malicious conduct. By the time of trial, Star Dairy had reduced the amount of damages it was seeking to $366,833.22, not because it did not believe that it could not prove its asserted damages going back for four years, but because it only wanted to pay its expert to calculate its damages for two years, 2018 and 2019.

3

In response to Star Dairy's Complaint, the Loehrkes asserted two counterclaims. First, the Loehrkes alleged that Star Dairy breached the implied duty of good faith and fair dealing because the Loehrkes always had to do Star Dairy's milk hauler's job for him when he came to collect their milk. The Loehrkes also alleged there were two samples of the Loehrkes' milk taken by Star Dairy's field man in April 2019 that showed there was no water in the milk and those samples were intentionally removed from Star Dairy's lab's records at Star Dairy's request. Second, the Loehrkes asserted that Star Dairy committed fraud, alleging that Michael Knaus was switching their milk samples for his personal benefit, that Star Dairy was not properly cleaning or sanitizing its trucks, that Star Dairy filled its milk truck with water before arriving at the Loehrke farm, and that Star Dairy was maliciously sabotaging the Loehrkes' milk. The Loehrkes alleged damages of $377,324.00, which was the expected gross income from milking they would regularly receive, plus damages of $34,984.03, which is what the Loehrkes should have been paid for their last load of milk delivered to Star Dairy. In all, the Loehrkes requested a money judgment against Star Dairy in the amount of $412,308.03.

## Statement of Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* Order of Reference (E.D. Wis. July 10, 1984) (available at www.wied.uscourts.gov/gen-orders/bankruptcy-matters). As a proceeding to determine the dischargeability of a debt, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and the Court may enter a final judgment. 28 U.S.C. § 157(b)(1). At the pretrial conference, all parties confirmed that they consented to the Bankruptcy Court's entry of final orders or judgments on all claims raised in the adversary proceeding, including on the counterclaims asserted by the Loehrkes.

## Legal Standard

Star Dairy has asserted that the Loehrkes owe it a nondischargeable debt pursuant to § 523(a)(2)(A) and § 523(a)(6) of the Bankruptcy Code. These provisions except from discharge debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" and debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Star Dairy "bears the burden of proving by a preponderance of the evidence that an exception to discharge applies." *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016) (citing *Grogan v. Garner*, 498 U.S. 279 (1991)). Proof by a preponderance of the evidence requires the plaintiff to present evidence that leads the Court to find that it is "more likely than not that the evidence establishes the proposition in question." *American Grain Trimmers, Inc. v. Office of Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999).

Section 523(a)(2)(A) requires the creditor seeking to except a debt from discharge based on a false representation to prove that: (1) the debtor made a false representation or omission, which the debtor either knew was false or made with reckless disregard for the truth; (2) the debtor possessed an intent to deceive or defraud; and (3) the creditor justifiably relied on the false representation. 11 U.S.C. § 523(a)(2)(A); *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010); *Field v. Mans*, 516 U.S. 59, 66 (1995).

"Actual fraud" can also form the basis for excepting a debt from discharge under § 523(a)(2)(A). *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 882 (2016); *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000). "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an

5

advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (citation omitted). Put another way, "actual fraud" includes "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id.* (citation omitted).

Section 523(a)(6) excepts from discharge debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Supreme Court analyzed the concept of a "willful injury" under § 523(a)(6) in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). Observing that the word "willful," read to mean "voluntary," "intentional," or "deliberate," modifies the word "injury," the Court reasoned that nondischargeability under § 523(a)(6) "takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* at 61; *see also First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 775 (7th Cir. 2013) ("the requisite intent for purposes of § 523(a)(6) is the intent to injure rather than the intent to act."). If the word "willful" did not constrain the exception in this way, "[e]very traffic accident stemming from an initial intentional act – for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic – could fit the description." *Id.* at 62. A "malicious injury" exists "when one acts in 'conscious disregard of one's duties or without just cause or excuse,'" but "does not require ill-will or specific intent to do harm." *Horsfall*, 738 F.3d at 775 (quoting *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994)). In sum, "[a] creditor invoking section 523(a)(6) must show that the debt at issue arises from an injury to the creditor's person or property, intentionally caused by the debtor, with some level of malice, wickedness, or a specific intent to inflict injury." *Heinrich v. Bagg (In re Bagg)*, 589 B.R. 650, 656 (Bankr. E.D. Wis. 2018) (citing *Horsfall*, 738 F.3d at 774-75).

6

**Analysis**

**I.**   **Star Dairy Has Established the Existence of a Nondischargeable Debt.**

The Court concludes that the Loehrkes obtained money from Star Dairy by false representations or actual fraud, that the Loehrkes willfully and maliciously injured Star Dairy, and that Star Dairy should be awarded a nondischargeable judgment against the Loehrkes in the amount of $366,833.22. The Court bases this conclusion on the following evidence presented at trial and the credibility of the witnesses who testified at trial.

    **A.**   **Cheese Made with the Loehrkes' Milk Failed to Set and Later Samples of the Loehrkes' Milk Contained Mostly Water.**

Michael and Gerard Knaus described a day in May 2019 when Gerard attempted to make a batch of farmers' cheese with his assistant. The cheese failed to set in the way Gerard expected after adding cultures, so he added more rennet and tried again. After cooking the mixture for longer than usual, Gerard produced one and a half tables of cheese, or 630 pounds, when he would have expected to have three tables, or 1,250 pounds. The brothers determined that the milk used to make the batch of cheese came from a single truckload of milk picked up by milk hauler Ed Meyer that happened to be in a silo by itself. The truckload of milk contained 42,000 pounds of milk, and according to Star Dairy's records, approximately 12,500 pounds of it came from the Loehrkes' farm.

On May 14, 2019 and May 16, 2019, the brothers directed Mr. Meyer, the milk hauler, to pick up the Loehrke milk and samples of the milk for testing. They further instructed Mr. Meyer to return to Star Dairy with the segregated load from the Loehrkes' farm without completing the other pickups he would ordinarily make on his route. This meant that Mr. Meyer would return to Star Dairy with only the Loehrkes' milk in his truck. Star Dairy sent the samples collected by Mr. Meyer at the Loehrkes' farm to the lab for testing. The samples had a low water content of

7

0.4% on May 14, 2019 and 2.59% on May 16, 2019. The Knaus brothers took their own samples of the same milk from the segregated loads and sent them to the lab. Michael Knaus testified that when he visually inspected the milk from the segregated load, it was very clear and lighter in color than skim milk from the store that has all the fat removed. The results showed that those samples contained 74.4% water on May 14, 2019 and 71.7% water on May 16, 2019. The evidence presented at trial demonstrated that there was a substantial amount of water in the Loehrkes' milk which was being presented to and purchased by Star Dairy as if it were Grade A milk and that the Loehrkes were switching milk samples to avoid detection of water in their milk.

### B. Samples of the Loehrke Milk Contained Impossibly High Levels of Butterfat.

The Knaus brothers thought that the Loehrkes were dumping the milk samples collected by the milk hauler and replacing them with whole milk to avoid detection of the water they were putting in their milk. Michael Knaus testified that Star Dairy paid a premium based on the amount of butterfat in the milk. He expected the average butterfat to be 3.8% to 3.9%, noting that butterfat exceeding 5% was "impossible." Gerard Knaus corroborated Michael's testimony, stating that the factory had a running average of 3.8% butterfat in its milk. Martin Cowie testified as an expert witness on behalf of Star Dairy. He is a certified public accountant and has worked with farms ranging from one hundred cows to thousands of cows and has developed extensive financial knowledge of all aspects of the dairy business including milk prices. Mr. Cowie testified that in his experience milk from Holstein cows typically contains 3.5% to 3.8% butterfat and milk from Jersey cows typically contains 4% to 4.2% butterfat.

Star Dairy's records showed that the Loehrke milk contained an impossible amount of butterfat. In reviewing Star Dairy's records from the lab that analyzes its patrons' milk samples, Michael Knaus identified an unusually high level of butterfat in the Loehrkes' milk going back

8

to 2018. He pointed to a sample from January 2018 that contained 4.28% butterfat and another sample from January 2018 that contained 79% water. He noted that he expected to see a more consistent amount of butterfat in the milk than what he saw throughout 2018, instead of a range from 1.16% to 4.7%. In reviewing the samples from 2019, he noted that a sample in April 2019 contained 11.21% butterfat which was "impossible." Additional high readings of butterfat in 2019 included 9.55%, 7.71%, 5.55%, 9.52%, 6.81%, 6.85%, 8.84%, 8.27%, 8.58%, and 9.46%. Michael Knaus testified there was "no way" a cow could produce milk with 8% to 9% butterfat.

Michael Knaus further commented on the extreme fluctuations of butterfat. By way of example, one day the butterfat sample would be 0.93% and two days later it would be 9.46%. Mr. Knaus stated that in his experience he did not expect to see variations in the amount of butterfat in a normal farmer's production which led him to the conclusion that the sample was changed at the farm. Mr. Cowie agreed, noting that these variations in butterfat should not happen and led to the conclusion that sample tampering was occurring. Mr. Cowie testified that in all of his years of working with and on farms he had never seen butterfat above 4.3% and that "animals can't create these [butterfat] numbers." The high amount of butterfat in the samples and the variations in the amount of butterfat in the samples over an extensive period of time leads to the conclusion that the Loehrkes were tampering with the samples to avoid detection of water in their milk.

Michael Knaus explained how the samples could have ended up containing an impossibly high level of butterfat. Butterfat rises to the top of milk and sticks to the side of whatever container holds the milk. This is why milk needs to be agitated in the bulk tank before a sample is taken. If someone takes a sample of milk, dumps it out, and then replaces it with a new second sample of milk, some of the butterfat from the first sample would naturally stick to the sides of the container. This would result in impossibly high butterfat numbers like those seen with the

9

Loehrkes' sample results.  This testimony also supports a conclusion that the Loehrkes were tampering with the samples.

The milk samples Ed Meyer brought back from the segregated loads on May 14, 2019 and May 16, 2019 also contained impossibly high levels of butterfat.  As noted above, after the Knaus brothers became suspicious that the Loehrkes were tampering with the milk samples collected by the milk hauler, they sent Mr. Meyer to the Loehrke farm to pick up only the Loehrke milk and to return to Star Dairy with this segregated load of milk.  The samples collected by Mr. Meyer from the segregated loads contained impossibly high levels of butterfat at 10.63% on May 14, 2019 and 5.58% on May 16, 2019.  By comparison, the Knaus brothers took their own samples of the same milk from the segregated loads and sent them to the lab.  The results showed that these samples of the same milk contained 1.06% butterfat on May 14, 2019 and 1.17% butterfat on May 16, 2019.  This is further proof that the Loehrkes were switching milk samples to avoid detection of the water they were putting in their milk.

### C.  Michael Knaus Credibly Testified About a Conversation with Mr. Loehrke in Which He Seemingly Confessed to Watering Down the Milk.

Michael Knaus credibly testified about a conversation he had with Mr. Loehrke after terminating the relationship with the Loehrkes after the test results came back showing that the Loehrkes' milk had more than 70% water in it.  He recalled that he called Mr. Loehrke and asked him to come to Star Dairy to speak with him "because this is ridiculous."  Mr. Knaus had a detailed recollection of his meeting with Mr. Loehrke at the dairy and the conversation that ensued, describing how he walked out of his office and stood on one side of a truck while Mr. Loehrke stood on the other side.  He asked Mr. Loehrke "what the heck he was thinking" and "why he was doing this."  Mr. Loehrke responded that he did not know what he was talking

about. Michael Knaus then asked him, "how long have you been doing this" to which Mr. Loehrke responded, "Not that long."

**D.** **The Loehrkes Had the Opportunity to Tamper with the Milk Samples that Star Dairy Collected.**

The testimony about the process by which the milk samples were collected demonstrated that the Loehrkes had the opportunity to replace the samples Mr. Meyer collected with whole milk, as the Knaus brothers suspected. Mr. Meyer testified that when he arrived at the Loehrke farm, he would back up to the milk house. Mr. Loehrke or one of his sons would take the hose out of the truck, something that none of the other farmers did. Mr. Meyer would make sure the agitator had been running for at least five minutes on a tank the size of the Loehrkes' tank before taking his sample. First, he would measure the amount of milk in the tank and view the milk using its sight glass. Then, he would climb a few steps up on a ladder, again visually inspect the milk, and then take his sample by dipping the dipper in the tank a few times, and adding two half dipperfuls to a plastic cylindrical vial approximately three ounces in volume. He would cap the container with a plastic cap with a sticker preprinted with the Loehrkes' patron number and handwrite the date, time, and temperature of milk. He would then come down from the top and finish his paperwork. While he was doing this, one of the Loehrkes would take the samples and dipper from the top of the tank in the milk house to the truck parked outside of the milk house and place them in the cooler in the back of the truck. One of the other Loehrkes would normally block the window in the door to the milk house so that Mr. Meyer would not have a clear line of sight to the back of the milk truck. During his trial testimony, Mr. Loehrke concurred with Mr. Meyer's testimony that he or one of his sons would take the samples drawn by Mr. Meyer from

the milk house to the cooler in the back of Mr. Meyer's truck.[1]  Mr. Meyer stated that no one else

had done this for him in his forty-five years on the job.

**E.  <u>The Evidence Showed That Mr. Loehrke Asked His Brother to Change the Loehrkes' Milk Sample on at Least One Occasion.</u>**

Both Michael Knaus and Mr. Loehrke testified about an incident in which Jeff Loehrke,

Mr. Loehrke's brother and a milk hauler for Star Dairy, went to the lab at Star Dairy and

switched one of the milk samples taken from the Loehrke farm, after being requested to do so by

Mr. Loehrke.  Mr. Loehrke admitted that he had asked his brother to check out a sample and that

he gave him a jar of milk.  Mr. Loehrke claimed that he was suspicious that Michael Knaus was

switching his samples.  He also claimed that the milk hauler was putting samples in his pocket

and that this was not normal.  He offered no reasons for why Michael Knaus, a fourth-generation

owner of a dairy that makes 53 million pounds of cheese each year from milk collected from

dairy farms within 50 miles of Star Dairy, would be switching the Loehrkes' milk samples.  He

---

[1] Mr. Loehrke's trial testimony was inconsistent with his deposition testimony.  During his deposition, Mr. Loehrke testified that Mr. Meyer would take the sample to the truck, not the Loehrkes.  He also claimed to not know where in the truck the sample went, or if there was a sample box or cooler in the back of the truck:

> Q:  And what would he [Mr. Meyer] typically do with that sample after he'd take it?
> A:  What would he do with it? He would put it in his truck.
> Q:  So he would then walk back to the truck?
> A:  (Witness nodding.)
> Q:  Is that correct?
> A:  Yes.
> Q:  And where on the truck did the sample go?
> A:  They have like a box in there. I'm not sure.
> Q:  You don't know?
> A:  They put it in a sample box in there.
> Q:  In a cooler? Yes, no?
> A:  I don't know what's in there. It's like a – it's a box they put it in. It's got a lid on it.
> Q:  All right. Then once he took the sample, did he do anything, did he test it or anything, or did he just put it in the truck?
> A:  I think he just put it in the truck.

Plaintiff's Ex. 15, Docket No. 39 at 18.  This inconsistency reduced Mr. Loehrke's credibility in the eyes of the Court.

also offered no thoughts on what could be wrong with the milk that would require his brother to go into the lab at Star Dairy to switch the sample taken by the milk hauler on the day of collection from the Loehrkes' farm. Based upon the Court's assessment of the credibility of the witnesses as they testified, the Court does not believe that Michael Knaus was switching samples and instead believes that the Loehrkes switched the sample to avoid detection of the water that they were putting in their milk.

**F. The Loehrkes Did Not Keep Production Records for Their Cows.**

The Loehrkes did not offer into evidence any milk production records for their cows. Mr. Loehrke testified that they did not keep written records regarding each cow's production. Mrs. Loehrke agreed, noting that they would keep information about each cow's production "in their heads" and knew each cow like a pet, but did not write the information down. As noted by Mr. Cowie, it is extremely unusual for a dairy farmer to not keep a record of milk production either by cow or by herd on a daily basis, even if the farmer has a small farm. Typically, dairy farmers want to know how much milk a cow is producing because they are paid based on the volume of milk that they produce. The higher the volume of milk that is produced, the bigger the milk check from the dairy. The production records assist with knowing when a cow is drying up and when a cow needs to be culled from the herd and replaced with a better milk-producing fresh cow. Keeping a fresh herd ensures that a dairy farmer continues to produce a high volume of milk which results in a bigger check from the dairy that buys the milk. The Loehrkes' failure to keep production records lends itself to the conclusion that the Loehrkes did not care about the volume of milk being produced by each cow because they were supplementing that production by watering down their milk, ensuring that they had a full milk tank each time the milk was picked up by Star Dairy.

13

**G. The Loehrkes Presented an Unusually Steady Volume of Milk to Star Dairy.**

The evidence presented at trial also showed that the volume of milk presented by the Loehrkes to Star Dairy for purchase was abnormally consistent. The Loehrkes' bulk tank could hold 13,700 pounds of milk. Star Dairy's records showed that the weight of the Loehrkes' milk at pick-up every other day was close to the capacity of the bulk tank, usually around 13,100 to 13,200 pounds of milk and not less than 12,800 pounds. *See* Plaintiff's Ex. 9, Supporting Documents (Docket No. 29).

Michael Knaus and Martin Cowie compellingly testified about why the Loehrkes' consistent volume production was abnormal and highly unusual. Both testified about how weather conditions impact a cow's production. Mr. Knaus noted that in the summer it becomes too hot for cows to milk, so production typically declines; however, no such decline was seen in the Loehrke's milk production. Mr. Cowie concurred, stating that in his experience in reviewing farmers' records, cows do not produce milk as well during the hottest and coldest months of the year. According to Mr. Cowie, the consistent volume of milk presented by the Loehrkes month after month just "does not happen in the dairy world."

Both also discussed the impact of cows' milk production drying up at different times. Mr. Knaus described how cows do not come into and out of the milking herd at the same rate. Instead, cows are rotated into the herd and out of the herd as needed based on an assessment of their production and as fresh cows are available. Cows produce milk for 300 days after calving. When one cow dries up, another milk producing cow needs to come in to replace that cow. He noted that when a cow dries up, there might not be another cow ready to come into the milking herd right away. This would result in a decrease in production for a period of time. He further noted that there would also be situations where four cows would be ready to come into the milking herd, but where the other cows had not yet dried up, which would result in an increase in

production for a period of time. As a result, and in his experience, milk production bounces around all year round and there is no way to have the same amount of milk produced all year round, like the Loehrkes presented to Star Dairy for purchase.

Mr. Cowie concurred, noting that the percentage of dry cows varies from one month to the next and this necessarily impacts the amount of milk produced. In his experience, there are months where a farm will produce more milk because there are fewer dry cows and months where a farm will produce less milk because there are more dry cows. As a result, and in his experience, the consistent volume of milk presented by the Loehrkes to Star Dairy month after month after month "just doesn't happen." Both Mr. Knaus and Mr. Cowie each commented that no other farmer who produced milk for Star Dairy produced as consistent of a volume of milk as the Loehrkes did.

It bears repeating that the Loehrkes did not keep any production records for their cows to refute any of this testimony and any records that the Loehrkes did have were destroyed shortly after the termination of their contract with Star Dairy and the sale of their cows for slaughter. All Mr. Loehrke could offer during his testimony was that their barn held 100 cows and on average his cows produced 70 pounds of milk each per day, which resulted in his bulk tank being almost full every two days. The abnormally consistent production of milk by the Loehrkes further supports a conclusion that the Loehrkes were adding water to their milk and then presenting that watered-down milk to Star Dairy for purchase.

**H. The Loehrkes' Cows Were Not in a Condition to Produce the Volume of Milk the Loehrkes Presented to Star Dairy.**

Star Dairy terminated its relationship with the Loehrkes on May 17, 2019 after receiving the results back from the lab that showed that the segregated loads picked up on May 14, 2019 and May 16, 2019 were between 71% to 74% water and the samples taken by the milk hauler at

15

the Loehrkes' farm showed an impossible amount of butterfat at 5.58% and 10.63%. Two days later, the Loehrkes sold their herd for slaughter. The Loehrkes sold 86 cows for slaughter at an average of $409.00 per cow. *See* Plaintiff's Ex. 6. Ron Carley picked up the cows and took them to the meat processing plant. Mr. Carley owns a livestock and real estate auction business and started in the livestock business when he was twelve years old, though he has also run a dairy farm and worked on a farm.

Mr. Carley testified at trial about the condition of the cows that he picked up from the Loehrkes' farm. He noted that the weight of a good cow would be about 1000 to 2000 pounds. He described the cows that he picked up from the Loehrkes farm as "extra light, light weight" (1 to 300 pounds), "light, light weight" (301 to 350 pounds), and "light weight" (351 to 400 pounds). Mr. Carley described one cow that weighed 253 pounds as "not desirable as a dairy cow" and noted that "light, light weight" and "light weight" cows are small cows. He further described "canner" and "cutter" cows as cows that weigh more than 401 pounds but are thinner cows that are best made into hamburger. The receipts for the Loehrke cows showed that Mr. Carley picked up 25 canner cows on one day with a total weight of 11,436 pounds for an average weight per canner cow of 457 pounds. The receipts also showed that two of the Loehrkes' cows needed to be condemned, one due to cancer and the other because it would not get up, which made both cows unsuitable for human consumption. Mr. Carley summarized the condition of the cows as "on the thinner side."

According to Mr. Carley, the cows were not suitable to be sold as dairy cows and the packing plant was the appropriate place for them. In his opinion, the Loehrkes' cows were not a good herd of milking cows or a resale herd, though he acknowledged that some might have brought a little more than slaughter price at auction. He further stated that if the Loehrke cows were producing 22,000 to 24,000 pounds of milk with high butterfat, the cows would have been

worth feeding and then auctioning as dairy cows. Mr. Carley remarked that the Loehrke cows were "not those type of cows." The condition of the Loehrke cows as described by an outside representative of the company that took the cows to slaughter further supports a conclusion that the Loehrkes were not producing the amount of milk that the Loehrkes presented to Star Dairy and instead were watering down their milk.

## II.  The Debt Owed to Star Dairy is Nondischargeable Under § 523(a)(2)(A).

All of this evidence, taken together, establishes that the Loehrkes obtained milk checks from Star Dairy based upon "false pretenses, false representations, or actual fraud" and therefore owe a nondischargeable debt to Star Dairy under 11 U.S.C. § 523(a)(2)(A). Star Dairy has proven by a preponderance of the evidence that the Loehrkes made false representations or omissions to Star Dairy that they knew were false or that they made with reckless disregard for the truth, with an intent to deceive or defraud Star Dairy, and Star Dairy justifiably relied on the Loehrkes' false representations.

The Loehrkes falsely represented that they were presenting Grade A milk to Star Dairy for purchase and that they were providing samples of their milk to Star Dairy. They also omitted to tell Star Dairy that they were watering down their milk. The fact that the Loehrkes' milk made half as much cheese as Star Dairy's master cheesemaker expected showed that the Loehrkes were watering down their milk. The samples taken from the segregated loads of the Loehrkes' milk showed that the Loehrkes "milk" contained 74.4% water on May 14, 2019 and 71.7% water on May 16, 2019. The abnormally consistent production of the same volume of milk by the Loehrkes month after month further supports a conclusion that the Loehrkes were adding water to their milk and then presenting that watered-down milk to Star Dairy for purchase. This is especially true based upon Mr. Carley's testimony that the Loehrkes' cows

were not in a condition to produce the volume of milk the Loehrkes presented to Star Dairy for purchase and had to be sold for slaughter instead of as a milking herd.

The evidence further showed that the Loehrkes acted with the intent to deceive or defraud Star Dairy into believing that they were selling Star Dairy Grade A milk when in fact they were selling Star Dairy watered-down milk. The Loehrkes were tampering with the milk samples they were providing to Star Dairy to avoid detection of water in their milk. The Loehrkes had the opportunity to switch their milk samples when they took the samples taken by the milk hauler to the cooler in the back of the milk hauler's truck, something that the milk hauler stated no one else did for him in his forty-five years on the job. The evidence further showed that on at least one occasion, Mr. Loehrke asked his brother to go to the lab at Star Dairy to switch a sample for him. The impossibly high amount of butterfat in the Loehrkes' milk samples, along with the drastic variations in the amount of butterfat in the Loehrkes' milk samples, offered further evidence of the Loehrkes' tampering with their milk samples to avoid detection of water in their milk. The Loehrkes' sample switching was perhaps best demonstrated by the testing completed on the segregated loads of milk taken from the Loehrkes' farm on May 14, 2019 and May 16, 2019. The samples the milk hauler brought back from the Loehrkes' farm showed little water and impossibly high amounts of butterfat. Samples of the same milk taken at Star Dairy showed that the Loehrkes' milk was three-quarters water and had little butterfat.

Given the long-standing relationship between Star Dairy and the Loehrkes, Star Dairy justifiably relied on the false representations or omissions from the Loehrkes that they were receiving Grade A milk from the Loehrkes farm and that the samples being provided were representative of the Loehrkes' milk.

Star Dairy has further proven by a preponderance of the evidence that the Loehrkes engaged in actual fraud. The Loehrkes intentionally presented watered-down milk to Star Dairy

18

and intentionally concealed that watered-down milk by switching the samples of their milk. This resulted in Star Dairy paying the Loehrkes for watered-down milk as if it were Grade A milk. The Loehrkes "suppressed the truth," their conduct involved "moral turpitude," and they engaged in "deceit, artifice, trick, or design involving direct and active operation of the mind . . . to circumvent and cheat" Star Dairy.

### III. The Debt Owed to Star Dairy is Nondischargeable Under § 523(a)(6).

The Loehrkes also acted willfully and maliciously as the courts have defined those terms and therefore owe a nondischargeable debt to Star Dairy under 11 U.S.C. § 523(a)(6). Repeatedly presenting watered-down milk to a dairy, and then concealing it by intentionally tampering with milk samples taken at the farm, is clearly a disregard of a farmer's obligations. The Loehrkes possessed a "specific intent to inflict injury." In watering down milk, the Loehrkes increased the volume of the milk, which is the main component of its price. By presenting this watered-down milk to Star Dairy, the Loehrkes obtained payment from the dairy to which they were not entitled. Star Dairy was unable to produce as much cheese with the watered-down milk as it would have been able to produce with whole milk, so the Loehrkes' conduct financially injured Star Dairy in this way as well. As lifelong farmers, the Loehrkes were necessarily aware that this is the consequence of watering down milk. Star Dairy has proven by a preponderance of the evidence that it was injured by the Loehrkes' conduct and that the Loehrkes acted maliciously, with a conscious disregard of their obligation as dairy farmers, and with a specific intent to injure Star Dairy by presenting watered-down milk to Star Dairy and concealing their tampering with the milk.

### IV. Star Dairy Has Proven $366,833.22 in Damages.

Mr. Cowie, Star Dairy's expert, explained how he determined that Star Dairy was damaged in the amount of $366,833.22 from January 2018 to June 2019. Mr. Cowie broke his

analysis of the damages sustained by Star Dairy into two categories: yield loss and financial loss.

He first explained how he calculated Star Dairy's loss of cheese yield (i.e. the pounds of cheese produced from the pounds of milk provided) due to the watered-down milk provided by the Loehrkes. Mr. Cowie reviewed Star Dairy's records from 2018 through May 2019 and selected several days on which Star Dairy produced a batch of Parmesan cheese using milk from a silo containing milk from the Loehrkes' farm and another batch of Parmesan cheese using milk from a silo that did not contain milk from the Loehrkes' farm. Parmesan cheese was chosen for the comparison because Star Dairy produces this cheese on an almost daily basis. The batches containing milk from the Loehrkes' farm produced less cheese.

Using the percentage of Loehrke milk in the batch, Mr. Cowie calculated the number of pounds of Loehrke milk that went into the cheese vat. He then calculated the pounds of cheese he would have expected this amount of milk to make, when compared to the batch made the same day from milk that did not contain Loehrke milk. He then divided the pounds of yield loss by the pounds of cheese he would have expected from the Loehrke milk. This resulted in a determination as to the percentage of water in the Loehrke milk. Based upon Mr. Cowie's calculations, the average percentage of water in the Loehrkes' milk was 69.79% in 2019 and 82.52% in 2018. *See* Plaintiff's Ex. 9.

Mr. Cowie then used this average percentage of water in the Loehrkes' milk to calculate the financial loss to Star Dairy. Mr. Cowie reviewed the milk tickets to determine the pounds of milk delivered by the Loehrkes and the amounts paid by Star Dairy to the Loehrkes every month from 2018 through May 2019. He then multiplied the amount of the milk from the Loehrkes by the percentage of water in the Loehrkes' milk to arrive at the pounds of real milk Star Dairy received from the Loehrkes. He then multiplied this amount by the milk price at the time to

arrive at the amount that Star Dairy should have paid the Loehrkes for their milk. Mr. Cowie arrived at his final damage calculation of $366,833.22 by subtracting the amount Star Dairy should have paid to the Loehrkes for the watered-down milk from the amount Star Dairy actually paid to the Loehrkes. In 2018, Mr. Cowie found that Star Dairy paid the Loehrkes $374,856.07, but should have paid $65,531.73, for an overpayment of $309,324.34, and in 2019, Mr. Cowie found that Star Dairy paid the Loehrkes $137,326.99, but should have paid $41,525.58, for an overpayment of $95,801.41.

The Loehrkes did not call an expert of their own, dispute Mr. Cowie's conclusion, or seriously dispute his method for calculating damages. The Loehrkes wanted the Court to draw the conclusion that it could have been another farmer's milk that could have resulted in the low cheese yields since the Loehrke milk was mixed with other milk in the silos from which Star Dairy drew the milk for each vat of cheese. However, Mr. Cowie credibly refuted this argument by noting that he intentionally chose samples for his review where the milk mixed with the Loehrke milk came from a variety of different farms, and he analyzed the lab records and production records for those other farms and none of those farms showed the same anomalies that he saw in the Loehrkes' records. His damage calculation also made sure to only include the percentage of the Loehrke milk that was in the silo of the milk that he was analyzing. Based upon Mr. Cowie's expert report and testimony, the Court finds that Star Dairy has been damaged in the amount of $366,833.32.

## V.  The Court Dismisses the Loehrkes' Counterclaims for Breach of the Duty of Good Faith and Fair Dealing and Fraud (Strict Responsibility).

The Loehrkes asserted two counterclaims against Star Dairy, one for a breach of the duty of good faith and fair dealing and another for "Fraud (Strict Responsibility)." First, the Loehrkes alleged that Star Dairy breached the implied duty of good faith and fair dealing because the

Loehrkes always had to do Star Dairy's milk hauler's job for him when he came to collect their milk and because there were two samples of the Loehrkes' milk taken by Star Dairy's field man in April 2019 that showed there was no water in the milk and those samples were intentionally removed from Star Dairy's lab's records at Star Dairy's request. Second, the Loehrkes asserted that Star Dairy committed fraud, alleging that Michael Knaus was switching their milk samples for his personal benefit, that Star Dairy was not properly cleaning or sanitizing its trucks, that Star Dairy filled its milk truck with water before arriving at the Loehrke farm, and that Star Dairy was maliciously sabotaging the Loehrkes' milk. The Court finds that the Loehrkes did not prove their counterclaims by a preponderance of the evidence at trial.

A. **The Loehrkes Have Not Proven a Claim for Breach of the Duty of Good Faith and Fair Dealing.**

Regarding the Loehrkes' breach of good faith and fair dealing counterclaim, the evidence presented at trial did not support such a claim. The Loehrkes appeared to argue that Star Dairy breached the implied duty of good faith and fair dealing by providing a milk hauler, Mr. Meyer, who was physically unfit to perform his duties and told them that all "he would need to do is rub his finger in the top of an empty sample container and the sample would be ruined and the farmer would be in trouble." Answer and Counterclaims, ¶ 43. There was no evidence at trial that Mr. Meyer ever made such a statement. In fact, Mr. Meyer credibly testified that he never threatened the Loehrkes in any such way. Additionally, Mr. Loehrke testified that, as a courtesy, his family assisted Mr. Meyer with some of the duties a milk hauler would typically perform. He did not suggest that it damaged the Loehrkes and he certainly did not quantify any damages related to the assistance his family provided.

The Loehrkes also alleged that Jim Everson, Star Dairy's field man, took two samples of their milk and took it directly to the lab for analysis. Once he found out the samples did not

contain an abnormal amount of water, he asked the lab to take the samples off the record. Again, the Loehrkes presented no evidence at trial to support these allegations. Mr. Everson did not testify at trial. Although Mr. Loehrke testified that Mr. Everson visited the farm, there was no evidence of what the samples showed or any acts by the field man after the analysis. For these reasons, the Loehrkes' breach of good faith and fair dealing counterclaim is dismissed.

## B. __The Loehrkes Have Not Proven Their Fraud Counterclaim.__

The Loehrkes also failed to establish any fraud by Star Dairy. The Loehrkes alleged that (1) Michael Knaus told them that he switched samples at the plant for his personal benefit; (2) the truck used to collect the segregated loads of milk from the Loehrkes' farm on May 14, 2019 and May 16, 2019 was not properly cleaned or sealed and was filled with water; and (3) Star Dairy did this on purpose to destroy the Loehrkes and their reputation. Answer and Counterclaims, ¶¶ 49-50.

Although Mr. Loehrke's testimony was not entirely clear, he testified that Little John, the milk hauler who would come on weekends, was taking a "pocket sample." Mr. Loehrke thought that Little John was changing the sample that the Loehrkes put in the truck from the bulk tank with the pocket sample that Little John took. He further testified that when he confronted Michael Knaus about the changing of the samples that Michael Knaus told him, "I changed the sample." The testimony was confusing and not credible. The Loehrkes did not call Little John as a witness to ask what he was doing when he took the alleged "pocket sample." There was no evidence presented related to what "personal benefit" Michael Knaus stood to gain by switching the Loehrkes' milk samples. None of the testimony taken or evidence presented at trial established that Michael Knaus tampered with the Loehrkes' milk or that the Knauses instructed their milk haulers to tamper with the milk samples collected from the Loehrkes' farm. Based

upon the Court's assessment of the credibility of the witnesses as they testified, the Court does not believe that Michael Knaus was switching samples of the Loehrkes' milk.

There was also no evidence that the truck that picked up the segregated load was filled with water. To the contrary, Michael Knaus credibly testified that the intake workers washed and sanitized the milk trucks following a standard procedure and that the dairy kept records of this cleaning. Once a truck is cleaned the back doors and top are shut and sealed with a red seal. Mr. Knaus further testified that when the trucks are cleaned, they are parked on a ramp with an incline of a foot and a half over a fifteen-foot stretch, so the front of the truck is elevated. The valve at the back of the truck is open, so all of the water used for cleaning drains from the truck before the back end is sealed. Mr. Meyer testified that he followed his usual routine when he picked up the truck to collect the segregated load of Loehrke milk on May 14, 2019 and May 16, 2019. This routine involved breaking the back seal of the truck. The top stayed sealed until the truck returned to the dairy. The Court rejects the Loehrke's claim that the truck used to collect the segregated loads was not properly cleaned or sealed and was filled with water.

Finally, there was no evidence that Star Dairy intended to harm the Loehrkes' reputation or suggestions of why it might have wished to do so. Michael and Gerard Knaus testified that they had no animosity towards the Loehrkes. Mr. Loehrke testified he was not aware of any animosity that the Knauses could have towards him, besides speculation that he did not describe. Mrs. Loehrke testified that she had no animosity towards the Knauses but believed the Knauses had animosity towards the Loehrkes, based on personal thoughts that she did not detail for the Court. For all of these reasons, the Loehrkes' fraud counterclaim is also dismissed.

C. **The Loehrkes Failed to Establish a Damages Figure.**

Furthermore, the Loehrkes presented no evidence to substantiate any damages related to either of their counterclaims. The Loehrkes alleged damages of $377,324.00, which was the

"expected gross income from milking that the Defendants regularly receive," Answer and Counterclaims, ¶ 55, plus damages of $34,984.03, which is what the Loehrkes should have been paid for their last load of milk delivered to Star Dairy. However, there was no testimony at trial and no records presented at trial to support any of these numbers. Additionally, Star Dairy should not have to pay $34,984.03 for a load of milk that was mostly water and that it dumped in a field. For this additional reason, the Loehrkes' counterclaims are dismissed.

<u>Conclusion</u>

For the reasons stated above, the Court holds that the Loehrkes obtained money from Star Dairy by false representations or actual fraud and that the Loehrkes willfully and maliciously injured Star Dairy. As a result, the Court will enter a nondischargeable judgment in the amount of $366,833.22 in favor of Star Dairy and against the Loehrkes. Additionally, all of the counterclaims asserted by the Loehrkes against Star Dairy will be dismissed with prejudice.

IT IS THEREFORE ORDERED: the debt owed to Weyauwega Star Dairy, Inc. by Randal L. Loehrke and Marjorie K. Loehrke in the amount of $366,833.22 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).

IT IS FURTHER ORDERED: the Loehrkes' counterclaims are dismissed with prejudice.

#####